**STATE OF FLORIDA,** a sovereign State of the United States of America; **THE STATE BOARD OF EDUCATION OF FLORIDA,** body corporate under the Constitution and Laws of the State of Florida, and **STATE BOARD OF CONTROL,** a body corporate under the Laws of the State of Florida, v. **WAYNE M. NEAL: THE LOUISVILLE DRYING MACHINERY COMPANY,** a corporation organized and existing under the Laws of the State of Kentucky; and **CITRUS PATENTS COMPANY,** a corporation organized and existing under the Laws of Florida.

12 So. (2nd) 590                                     January Term, 1943
March 23, 1943                                              Division A
Rehearing Denied April 13, 1943

*J. Tom Watson,* Attorney General, *Paul E. Raymond* and *Lewis W. Petteway,* Assistant Attorneys General, for appellants.

*Austin Miller* and *L. R. Milton,* for Appellee Wayne M. Neal and *Hugh M. Akerman* for Appellee Louisville Drying Machinery Company, and Citrus Patents Company, appellees.

TERRELL, J.:

In June 1929, Dr. Wayne M. Neal was employed as assistant in animal nutrition at the experiment station, University of Florida, his employment being general. In 1933, Project No. 239 was set up under what is known as the Purnell Fund and Dr. Neal was assigned to the project, the scope of which

was to study the digestibility, coefficients, and feeding value of dried citrus waste (refuse from grapefruit and orange canning factories). The project was later extended by verbal instruction to include methods by which dried citrus waste could be made available as a dairy feed, the problem being to find a better method of excluding the moisture from it.

In the summer of 1935, while working on the project Dr. Neal developed such a method and set out to have it patented. After a conference with representatives of the experiment station he proceeded to Washington where he employed an attorney and applied for a patent to his discovery. He was advised that patent could not issue in the name of the experiment station but must be issued to an individual so he applied for it in his own name and then before it was perfected, assigned his application to Citrus Patents Company, one of several parties who appear to have been working on a similar project.

Appellants as complainants forthwith filed their bill of complaint against Neal and Citrus Patents Company praying that they be decreed to be the rightful owners of said patent by virtue of the contract of employment, that Citrus Patents Company holds the assignment from Neal with knowledge of plaintiffs' rights, that Neal be required to restore to Citrus Patents Company any funds received by him in consideration of his assignment and that he be required to fulfill his obligation to complainants (appellants here) under his contract.

On final hearing on bill and answers, the chancellor found that Dr. Neal was employed under a general contract of employment and was under no obligation to assign his patent to his employer, that he at no time held it in trust for his employer and that Citrus Patents Company was a bona fide purchaser for value and without notice. Complainants appeal from this decree.

In State Board of Education v. Bourne, 150 Fla. 323, 7 So. (2nd) 838, we reviewed a case in some aspects similar to this and there held that an employer could not claim the patent of an employee unless the contract of employment by express terms or unequivocal inference shows that the employee was hired for the express purpose of producing the thing patented.

If the employment is general and the invention is incident to it, the employer cannot claim the patent. He must show that the employment was for the specific purpose of making the invention.

The chancellor's holding was predicated on the finding that the contract between appellants and appellees was a general contract of employment, that it at no time contemplated a contract to invent the process in question and that there was at any time an agreement on the part of Neal to assign the patent, it amounted to nothing more than one to make a contract in the future which was never consummated.

Isolated factors in the transaction support this conclusion but when looked at in the light of what took place over the ten year period in which it transpired, we are driven to a different view. The contract or employment was in its inception general but when Project No. 239 was set up under the Purnell Act and Dr. Neal placed in charge, it was from that time hence for the express purpose of accomplishing the result that was accomplished. It is quite true that the idea was incipient and perhaps nebulous but the need for it was urgent and the very purpose of Project No. 239 was to make it a concrete reality.

The following supports this conclusion: (1) The Purnell Act of Congress under which Project No. 239 (7 U.S.C.A. par. 370.) was set up, limits allotments to the State to pay the expense of "conducting investigations or making experiments bearing directly on the production, manufacture, preparation, use, distribution, and marketing of agricultural products and including such scientific researches as have for their purpose the establishment and maintenance of a permanent and efficient agricultural industry." (2) Dr. Neal was placed in charge of Project No. 239, gave the major portion of his time to it and while doing so conceived the improved method for drying citrus waste, the right to patent for which is the basis of this suit. (3) In making his research and experiments to perfect this process, he employed the laboratories and other facilities of his employer. (4) His expenses in securing the patent including attorneys' fees, patent office fees, and his expenses to Washington, all

amounting to more than $1200 were paid from the Purnell Fund by his employer. ' (5) No satisfactory method for drying citrus waste had been developed and when Dr. Neal was given charge of the project, he was instructed to conduct research with the view of developing a better method. (6) Dr. Neal appears to have gone to Washington to secure the patent in the name of his employer but found on arrival that the application would have to be made in the name of an individual so made it in his own name. (7) The modification of Project 239 from time to time and the unanimity with which Dr. Neal and his employer construed it as shown by correspondence and other evidence support this view.

The very purpose of the Purnell Act was to encourage projects like this and its funds were accepted by the experiment station with knowledge of this. The experiment station was designed for works of this kind and not as an aid to private enterprise. One of the things most desired at the time was a process by which citrus waste could be utilized. The correspondence and the testimony of all the parties to this transaction shows that this was their understanding and that Dr. Neal was employed for this purpose. One of the most conclusive proofs of this is the fact that the experiment station paid all the expense of securing the patent including Dr. Neal's expenses to Washington for that purpose from the Purnell Fund.

It is quite true that there was not an express contract to invent the process but the circumstances recited show by "unequivocal inference" as recited in State Board of Education v. Bourne, supra, that Dr. Neal's employment was for that express purpose. When every factor in the transaction and the evidence conclusively supports this, that is sufficient. The fact that the project was modified by verbal instructions is not material since they were proven beyond question. The record also conclusively shows that the Doctor had no other idea until he sniffed the commercial potentialities of the invention. Ever since the hegira from Goshen there has been something about the greenback aroma of commercial potentialities that afflicts its victim with a nostalgia for the flesh pots of Egypt. The Doctor appears to have been well doused.

It is accordingly our view that the invention in question was the product of Dr. Neal's contract of employment and that under the rule announced in State Board of Education v. Bourne, supra, where the law of the case is fully discussed, it inured to his employer. In this holding, we do not overlook the contention that Dr. Neal agreed to assign the patent to appellants on condition that he be given a share in any royalties that might accrue from it. This was nothing more than a gratuity offered by a representative of appellants. Whether or not it was approved by them, the record does not disclose; at any rate we hold the contract conclusive.

On the question of whether or not Citrus Products Company was a purchaser in due course without notice, it appears that reliance is placed primarily on a conversation they had with the director of the experiment station who said in substance that they had nothing more than a gentleman's agreement with Dr. Neal and that if he repudiated that, appellants had no way to enforce it.

This was a misleading statement but there were plenty of red flags flying to warn appellees. The contract between the experiment station and Dr. Neal was the determinative answer to this question and the record shows that appellees were on notice of this contract. They were also on notice of the Purnell Act and its purpose. Either of these factors was sufficient answer to this question so we do not deem it necessary to labor the opinion with further discussion of the question of notice.

The decree appealed from is reversed with directions to the chancellor to enter an appropriate decree for appellants. He is further directed to enter such decree as justice and equity may require as to Louisville Drying Machinery Company and as affecting it and W. M. Neal and Citrus Patents Company.

BUFORD, C. J., CHAPMAN and ADAMS, JJ., concur.