157 So.2d 829 (1963)
HAROLD S. GOODRICH, FORREST O. HOBBS AND DON M. SIX, INDIVIDUALLY AND AS TRUSTEES, APPELLANTS,
v.
GEORGE R. MALOWNEY, APPELLEE.
No. 3289.
District Court of Appeal of Florida, Second District.
November 6, 1963.
Rehearing Denied December 11, 1963.
Forrest O. Hobbs and Robert F. Nunez, Tampa, for appellants.
Thomas A. Clark (of Mabry, Reaves, Carlton, Fields & Ward), and Emmett J. Comiskey, Tampa, for appellee.
KANNER, Judge.
Seeking to recover damages for alleged conversion of 233 shares of stock in Hallmark *830 Apartments, Inc., plaintiff-appellee, George R. Malowney, sued defendants-appellants, Harold S. Goodrich, Forrest O. Hobbs, and Don M. Six "individually and as trustees." Verdicts of $8,356.70 compensatory and $3,000 punitive damages were returned by the jury against appellants. The judgment consequent upon the verdicts is assailed on the appeal.
Hallmark Apartments, Inc., was initiated in 1960 by Malowney for construction of a co-operative apartment building. He became a director, the corporation's first president, and its largest shareholder. One John Williams was vice-president, later being replaced by appellant Six; Goodrich was treasurer; and Hobbs ultimately became secretary. All three appellants were directors and stockholders. The total stock subscription, at $100 per share, was about $110,300. Of this, Malowney acquired 233 shares, or approximately 20 per cent, representing an investment of $23,300. Construction costs for the apartment building were almost $200,000.
Malowney placed with the Marine Bank and Trust Company of Tampa his 233 shares of stock which are the subject of this controversy. This was required by the bank as collateral security for a loan of $15,000 to Hallmark Apartments, Inc., which loan had been authorized through corporate resolution passed by the board of directors on July 26, 1960. Williams, the corporation's vice-president, also assigned as additional security for this loan his 50 shares of stock; both signed the note personally and Malowney also signed in his official capacity. Some months previously, on April 22, 1960, Williams had negotiated a personal loan to himself of $3,500 from the same bank. Malowney cosigned this note; the corporation was in no way involved in the transaction.
At a meeting of the stockholders held on November 3, 1960, Williams resigned as vice-president and Six was elected to replace him. Two weeks later, on November 17, 1960, Six, as vice-president, executed a warranty deed attested to by the corporation's secretary, Hobbs, conveying the total assets of Hallmark Apartments, Inc., except office equipment, to himself, Goodrich, and Hobbs as trustees for the corporation. There was no notice to nor any meeting of the directors or stockholders to authorize this and it was not until considerably later that Malowney learned about the trust deed.
On January 20, 1961, appellants as trustees acquired possession of Malowney's 233 shares of stock and the 50 shares of Williams. This came about upon execution by them as trustees and by the corporation under signature of Six as vice-president, attested to by Hobbs as secretary, of a mortgage to the bank for $18,694.29 on certain vacant business lots of the corporation as security, this sum being used to pay the $15,000 loan which had been made to the corporation and the Williams personal loan of $3,500 which Malowney had cosigned, plus interest on both notes. In doing this, appellants utilized no personal funds. Malowney did not learn of the mortgage nor of the assignment by the bank of his pledged shares of stock until early March of 1961.
On February 20, 1961, appellants convened a stockholders' meeting attended by no one other than themselves, no others having been notified. They adopted a new set of by-laws, voted to discharge the board of directors, including Malowney, and elected a new slate, consisting of themselves, along with two others. They, as directors, next called a meeting of the new board, still with only themselves notified or present; the officers of the corporation were then removed; and appellants were re-elected, along with one new officer. For this purpose, appellants utilized certain proxies and voted Malowney's 233 shares of stock.
Malowney, on or about March 5, 1961, returned to Hallmark's office after an absence of a few hours to find that the furniture had been removed. About three days later he received a copy of the minutes of *831 the February 20, 1961, meeting. In April of 1961, Malowney's attorney through letter to each appellant issued a demand upon them for return of his stock. Appellants refused.
During the pre-trial phase of the litigation, the court below by order dismissed a styled second amended counterclaim which had been filed against Malowney by appellants individually and as trustees, and Hallmark Apartments, Inc. At the conclusion of all the evidence, the trial court granted Malowney's motion for a directed verdict upon the issue of appellants' liability for conversion, leaving to the jury the questions of the amount of compensatory damages and of whether or not punitive damages should be awarded. Appellants' motion for directed verdicts both as to compensatory and punitive damages were denied.
Dismissal by the trial court of the second amended counterclaim is cited as error by appellants. When the counterclaim as amended was filed, although appellants named Hallmark Apartments, Inc., as a party, they had made no application to the court seeking permission to do so. In its order the court, among other things, found that the second amended counterclaim shows that, if a claim exists against Malowney, it would exist in Hallmark Apartments, Inc., and not in defendants-appellants Goodrich, Hobbs, and Six, the parties to the litigation, and consequently would not come within the requirements of Rule 1.13, Florida Rules of Civil Procedure, 30 F.S.A. as being a counterclaim which a third party could assert against Malowney. The court then found that Hallmark Apartments, Inc., had never been made a party to this suit pursuant to Rule 1.17, and consequently could not assert any claim against Malowney. Also in connection with adding Hallmark Apartments, Inc., as a party, see Rule 1.18. Other reasons were given by the court for dismissing the counterclaim, but the order concluded with the court's granting of leave to the corporation or anyone legally representing its rights "to file such pleadings as it or they may be advised within twenty (20) days." This prerogative was not elected. We agree that there was adequate basis for the trial court's order of dismissal.
From our study of the case, there are three salient questions which emerge for our determination, 1. whether there was sufficient evidence to support the trial judge's decision to direct a verdict upon the issue of conversion, 2. whether the evidence will sustain the jury's award of compensatory damages, and 3. whether or not punitive damages are justified under the facts.
Both in Florida and generally, a conversion has been defined as being an act of dominion wrongfully asserted over another's property inconsistent with his ownership of it. The essence of conversion lies within an unauthorized act which deprives another of his property permanently or for an indefinite time; it is the disseisin of the owner or an interference with legal rights incident to ownership, such as the right to possession. The necessary element of a conversion is wrongful deprivation of the owner of his property. Familiar expressions descriptive of the gist of such a wrong are said to be "interference with the dominion of the true owner", "exercise of dominion to the exclusion and in defiance of the plaintiff's right", and "unauthorized assumption of the powers of a true owner." Star Fruit Co. v. Eagle Lake Growers, 1948, 160 Fla. 130, 33 So.2d 858; Quitman Naval Stores Co. v. Conway, 1912, 63 Fla. 253, 58 So. 840; 7 Fla.Jur., Conversion, sections 2 and 7, pages 267, 270.
Appellants urge with respect to the issue of conversion that their refusal to return the stock when demanded was not unqualified, this being premised upon the contention that there should be an accounting by Malowney to the corporation for claimed indebtedness to it, including failure of Malowney to tender the $3,500 which was incident to appellants' execution of the mortgage to the bank. Thus, they say, Malowney was not entitled to immediate *832 possession. Additionally, they argue that, having taken an assignment as trustees, they had a right under the by-laws to vote Malowney's stock.
Under the pleadings, the amended complaint is for conversion of Malowney's stock, and its objective is both compensatory and punitive damages. The only defense set up by appellants is simply a general denial; so there is no basis in their defensive pleading either with respect to an accounting or a debt by Malowney to the corporation of $3,500. Nor does the evidence show they ever broached the subject to or informed Malowney of the secretly assumed obligation of $3,500 nor that they mentioned any accounting to Malowney, but the only evidence as to this is Hobbs' testimony that he told Malowney's attorney in a telephone conversation about the $3,500 and about the matter of settling differences between Malowney and the corporation. It was admitted by Hobbs that this transpired after Malowney's attorney had written to appellants concerning the stock and after their exercise of dominion and control over it by using it without Malowney's knowledge as if they owned it, voting it to oust him as president and director of the corporation. Furthermore, as to claimed indebtedness from Malowney to Hallmark Apartments, Inc., the trial court through its order granted leave for the filing of further pleadings, but none were filed.
To support their contention with respect to qualified refusal, appellants cite 53 Am. Jur., Trover and Conversion, section 45, page 842; but a reading of this section demonstrates that certain requirements are to be met to bring one within the operation of the qualified refusal principle. Thus, the following specific statement in the cited section, when applied to the evidence in this case, plainly refutes appellants' position upon the subject of qualified refusal:
"* * * However, it is essential, if liability for a conversion is to be avoided, that the qualification attached to the refusal be sufficiently disclosed to acquaint the plaintiff with the fact that the refusal represents no wrongful assertion or claim inconsistent with his rights as to title or possession of the property."
Here, it does not appear that appellants' refusal to return Malowney's stock was qualified by any reason sufficient to meet the requirement of this principle.
Over and above this, appellants' conduct involved, not just the mere withholding of Malowney's stock, but also their using of it without Malowney's knowledge to divest him of his status in the corporation. The purpose of proving a demand for property by a plaintiff and a refusal by a defendant to return it in an action for conversion is to show the conversion. The generally accepted rule is that demand and refusal are unnecessary where the act complained of amounts to a conversion regardless of whether a demand is made. Louisville & N.R. Co. v. Citizens' & People's Nat. Bank, 1917, 74 Fla. 385, 77 So. 104, L.R.A. 1918C 610; 53 Am.Jur., Trover and Conversion, section 88, pages 880-883.
The corporate by-law under which appellants say they had a right to vote the stock provides under Article I, section 9:
"A shareholder whose shares are pledged shall be entitled to vote such shares until the shares have been transferred into the name of the pledgee, and thereafter the pledgee shall be entitled to vote the shares so transferred."
The by-law shows that a shareholder who has pledged his stock is entitled to vote it. This changes only when it actually has been transferred as stock into the name of the one to whom it was pledged. Here, we do not have such a transfer. Initially, there had been only a pledging of Malowney's stock to the bank as collateral for a loan, and this was the status of the stock when appellants got possession from *833 the bank by virtue of the mortgage given on property of the corporation. There is no dispute that the stock of record is in Malowney. Moreover, the bank employee's statement that the $3,500 personal loan made to Williams would have to be taken care of along with the $15,000 corporation loan was no justification for them to have imposed on the corporation this encumbrance with which it had no concern. It will be recalled that appellants executed the mortgage, not only as trustees, but in the name of the corporation as well, with Six signing as vice-president and Hobbs attesting to it as secretary, with no meeting, no notice, and no record of the proceedings. Their present claim that they had a right to vote the stock, therefore, insofar as Malowney's rights are concerned, is silhouetted against the background of the described process whereby they came into possession, in secrecy and in violation of the corporation's by-laws.
A resume of the evidence as it relates to recognized principles of conversion thus reveals a situation where Malowney, as president, a director, and the largest shareholder of the corporation, was kept in ignorance of the precursive steps leading up to the voting by appellants of his stock, including the transfer of the corporate assets, the mortgage to the bank of corporate property with assumption on behalf of the corporation of an obligation for which it was not liable, and the procuring of Malowney's stock; and finally, he was kept in ignorance of the exercise of dominion and control by appellants over his stock through voting it without his knowledge to destroy his official and directorial connection with the corporation, doing this at a meeting held without notice in violation of the corporate by-laws and in nonconformity with section 608.11, Florida Statutes, F.S.A. for the holding of such a meeting. Section 608.11 provides as follows:
"* * * when stockholders who hold four-fifths of the voting stock having the right and entitled to vote at any meeting shall be present at such meeting, however called or notified, and shall sign a written consent thereto on the record of the meeting, the acts of such meeting shall be as valid as if legally called and notified."
By the above language, in order to hold the meeting without notice, it was necessary that stockholders holding four-fifths of the voting stock be present. To this end, appellants utilized Malowney's stock to get rid of him, after having gotten possession of the stock in the manner which we have narrated. They had no right to vote the stock; thus the purported meeting and that which transpired during the course of it proceeded in violation of the terms of the statute and of Malowney's rights.
Among the corporate by-laws violated by appellants variously during the course of the delineated activities are certain of those contained in Article III. These include section 3, providing that "The President shall preside at all meetings of the Board of Directors and Stockholders. * * * He shall cause to be called regular and special meetings of the Stockholders and Directors in accordance with these By-Laws. * * * He shall sign and make all contracts and agreements in the name of the Corporation." On the other hand, this same section states that "During the absence and inability of the President to render and perform his duties or exercise his powers, as set forth in these By-Laws or in the acts under which this Corporation is organized, the same shall be performed and exercised by the Vice-President * * *." In this connection, it may be noted that the corporation's president was at all pertinent times available at the office of Hallmark Apartments, Inc., for performance of his duly constituted duties and for exercise of the authority vested in him. Moreover, Hallmark Apartments, Inc., was all the while a continuing, live corporate entity.
Illustrative of facts where the unauthorized and wrongful act of dominion and control over property of another was the gist *834 of the conversion is the case of Home Insurance Co. of New York v. Handley, 1935, 120 Fla. 226, 162 So. 516. There, an insurance agent, who was also an employee of a certain bank, issued a fire insurance policy to plaintiff and reported it to the company on the date of its issue. Since the insured owed a debt to the bank, the policy, with the owner's consent, was held by it as security to protect the loan. About two weeks after issuance of the policy, the insurance agent, without consulting or notifying the insured, took the policy upon which the premium had been paid and upon direction of the insurance company, sent it to its office to be cancelled, intending to replace it with a policy in another company of which he was the agent and to use the premium which had been paid for that purpose. The first knowledge of insured that the policy had been withdrawn was upon request for its return after fire had consumed the premises. The court said of the taking of the policy from the bank's possession that the act was an assumption of general ownership, or the assertion of a power to place the policy in the possession of the company which was inconsistent with the insured's rights and ownership and so was a conversion.
Where the state of the evidence at the conclusion of the trial permits no reasonable inference except that the defendant was liable in conversion as charged, it is proper for the court to direct the verdict against the defendant on the issue of liability and submit to the jury the question of damages. Mid-State Investment Corporation v. O'Steen, Fla.App. 1961, 133 So.2d 455, cert. denied, Fla., 136 So.2d 349. The evidence here establishes the elements of conversion; there was no controverting evidence to create an issue upon this subject. It was therefore incumbent upon the trial judge, at the close of that evidence, to direct the verdict upon appellants' liability.
We turn to the question of evidentiary support for the jury's award of compensatory damages. Appellants claim that the figures supplied by their appraiser were ignored. It appears, however, that the jury reconciled the conflicts existing in the appraisals offered by the respective parties, arriving at a figure in between the two.
We next consider the question of whether or not the evidence is sufficient to warrant a verdict for punitive damages. Punitive or exemplary damages has been defined as a sum allowed over and above actual or compensatory damages; allowance of it depends upon malice, moral turpitude, wantonness, or outrageousness of the tort. Dr. P. Phillips & Sons, Inc. v. Kilgore, 1943, 152 Fla. 587, 12 So.2d 465; Ross v. Gore, Fla. 1950, 48 So.2d 412; Glickstein v. Setzer, Fla. 1955, 78 So.2d 374.
Circumstances surrounding or accompanying the present conversion reveal a course of conduct which we have already delineated. This conduct, involving a cumulative pattern of secret acts of appellants carried out over a period of several months in disregard of Malowney's official and proprietary rights, may again be summarized: 1. the secret conveyance by appellants into themselves as trustees of the assets of the corporation with no notice, no meeting, and no record of their proceedings; 2. the taking by appellants of Malowney's stock through execution of a mortgage upon corporate property, not only to pay the corporation loan but also to pay a personal loan incurred by a third party for which the corporation was not liable, doing this in the name of the corporation as well as by themselves as trustees, again with no meeting, no notice, and no record; 3. the holding of a stockholders' meeting on February 20, 1961, without notice and appellants' unauthorized employment of Malowney's shares of stock without his knowledge through voting it to his injury.
The jury must have concluded that appellants' conduct was of the character and degree to come within the exemplary or *835 punitive damages rule. When the trial judge denied appellants' motion for new trial, he sustained the result of their deliberations.
We find no reason to disturb the judgment.
Affirmed.
SMITH, C.J., and SHANNON, J., concur.