**J. Michael TEETS, Plaintiff/Cross–Appellant,**

v.

**CHROMALLOY GAS TURBINE CORPORATION, Defendant–Appellant.**

Nos. 95–1379, 95–1389.

United States Court of Appeals, Federal Circuit.

May 7, 1996.

Rehearing Denied; Suggestion for Rehearing In Banc Declined July 1, 1996.

404

Robert E. Pershes, Pershes & Schwartz, P.A., Coral Springs, Florida, argued, for plaintiff/cross-appellant.

Stanley H. Lieberstein, Ostrolenk, Faber, Gerb & Soffen, L.L.P., New York City, argued, for defendant-appellant. With him on the brief were Douglas A. Miro and Marc A. Lieberstein.

Before NEWMAN, MICHEL, and RADER, Circuit Judges.

Opinion for the court filed by Circuit Judge RADER, Circuit Judge NEWMAN concurs in the result.

RADER, Circuit Judge.

Chromalloy Gas Turbine Corporation (Chromalloy) and J. Michael Teets dispute ownership of an invention called the hot forming process (HFP). Following a bench trial, the United States District Court for the Southern District of Florida concluded that Teets solely owned the HFP and enjoined Chromalloy from certain uses of the HFP. Because the district court erred in concluding Teets owned the process, this court reverses.

## BACKGROUND

The General Electric Aircraft Company (GE) developed a more powerful and fuel efficient jet engine called the GE90. In conjunction with this development, GE designed a composite turbine engine fan blade which was lighter than existing metal fan blades. These lightweight blades, however, fractured more frequently from contact with birds, freezing rain, and other debris.

GE tried to solve this problem by fitting the leading edge of the blade with a hard protective covering of electroform nickel. After initially failing to manufacture the edge internally, GE asked DRB Industries, a division of Chromalloy, to devise a method of manufacturing the leading edge for the new composite blades. GE specified that DRB should make the leading edge of one piece of titanium. In fact, GE offered DRB a long-term contract if it was successful.

DRB labelled this project the GE90 Project. Less than a month later, in November 1991, Douglas R. Burnham, General Manager of DRB, assigned Teets as the Chief Engineer on the GE90 Project. Teets spent at least 70% of his time on the GE90 Project. At this time, Teets was an employee at will and had no written employment contract addressing ownership of inventive work. Burnham, on the other hand, had contractually

agreed to assign any inventive rights to DRB.

On November 1, 1991, DRB proposed several initial manufacturing designs. All the proposals involved welding or diffusion bonding several pieces together to form the leading edge. On November 12, 1991, GE agreed to purchase some welded and bonded fan blades. In that agreement, however, GE indicated its desire that DRB continue to work toward a one-piece leading edge. In fact, GE specifically stated in the purchase agreement that it would enter into a long-term contract with DRB for production quantities of leading edges if DRB successfully developed a cost-effective method of manufacturing the one-piece leading edge.

In early 1992, GE discovered problems with DRB's weld method. The welds were porous, distorted, and suffered breakage at the joints. In response, GE ordered design changes. On March 12, 1992, Burnham and Teets met to discuss GE's required changes. During this meeting, Teets showed Burnham sketches he had drawn at home depicting Teets's initial idea for the HFP. Burnham thought the idea had potential. Nonetheless he instructed Teets to make changes in the welding process because GE would not alter its delivery schedule for design changes. Teets refined the HFP idea while still working on GE's changes to the welding process. Other employees at DRB assisted Teets in his refinement of the HFP process.

On April 21, 1992, Teets submitted a more detailed sketch of the HFP idea to Douglas Burnham and to Nigel Bond, GE's lead engineer on the GE90 Project. DRB also proposed other new approaches at this meeting. GE rejected all of the proposals.

In July 1992, GE tested the welded leading edges. Test results showed a complete composite failure. By August 1992, however, Teets had successfully tested the HFP at DRB. On the basis of this test data, DRB gained approval from GE. In October 1992, GE ordered 450 pieces using the HFP. Thereafter, GE continued to order one-piece leading edges manufactured with the HFP. In fact, GE still uses the HFP to manufacture leading edges for its GE90 engines.

In late 1992, Teets discussed with Burnham the need to seek patent protection for the HFP. On January 25, 1993, Teets sent a letter describing the HFP to Mitchell Bittman, patent counsel for Sequa Corporation, Chromalloy's parent company. In that letter, Teets states that DRB developed the HFP. On January 26, 1993, Teets and Burnham completed an invention disclosure form in preparation for a patent application. Teets identifies Burnham as co-inventor on that form. Both Teets and Burnham later assisted Bittman in the prosecution of a patent application for the HFP. The record in this appeal does not indicate if a patent has issued.

Teets first asserted sole ownership of the HFP process in April 1993. He, however, continued to assist in the prosecution of the patent application. On June 18, 1993, Teets filed this action against Chromalloy, seeking, among other things, a declaration of ownership of the HFP. On a summary judgment motion, the court concluded that Chromalloy held a shop right in the process. The district court then proceeded to try the issue of ownership. After a bench trial, the district court concluded that Teets solely owned the HFP and enjoined Chromalloy from licensing, selling, or transferring the HFP for third-party use. The district court made comprehensive findings of fact which the parties do not dispute.

## DISCUSSION

The party challenging a district court decision bears the burden of demonstrating reversible error. *King Instruments Corp. v. Perego*, 65 F.3d 941, 945, 36 USPQ2d 1129, 1131 (Fed.Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1675, 134 L.Ed.2d 778 (1996). This court will not set aside a trial court's findings of fact unless an appellant demonstrates clear error in those findings. Fed.R.Civ.P. 52. A finding of fact is clearly erroneous if the record lacks adequate evidence to support it "so that our review of the entire record leaves us with the definite and firm conviction that a mistake has been made." *Reich v. Department of Conserva-*

*tion & Natural Resources,* 28 F.3d 1076, 1082–83 (11th Cir.1994) (quotations omitted).

■ Ownership springs from invention. The patent laws reward individuals for contributing to the progress of science and the useful arts. *See* U.S. Const. art. I, § 8. As part of that reward, an invention presumptively belongs to its creator. *See Beech Aircraft Corp. v. EDO Corp.,* 990 F.2d 1237, 1248, 26 USPQ2d 1572, 1582 (Fed.Cir.1993); *Arachnid, Inc. v. Merit Indus., Inc.,* 939 F.2d 1574, 1578, 19 USPQ2d 1513, 1516 (Fed. Cir.1991). This simple proposition becomes more complex when one creates while employed by another person.

■ Consistent with the presumption that the inventor owns his invention, an individual owns the patent rights even though the invention was conceived and/or reduced to practice during the course of employment. *Hapgood v. Hewitt,* 119 U.S. 226, 233–34, 7 S.Ct. 193, 197–98, 30 L.Ed. 369 (1886). At the same time, however, the law recognizes that employers may have an interest in the creative products of their employees. *Solomons v. United States,* 137 U.S. 342, 346, 11 S.Ct. 88, 89, 34 L.Ed. 667 (1890). For example, an employer may obtain a shop right in employee inventions where it has contributed to the development of the invention. *McElmurry v. Arkansas Power & Light Co.,* 995 F.2d 1576, 1581–82 (Fed.Cir.1993). A shop right permits the employer to use the employee's invention without liability for infringement. *Id.* at 1580.

■ In addition, contract law allows individuals to freely structure their transactions and employee relationships. An employee may thus freely consent by contract to assign all rights in inventive ideas to the employer.

■ Without such an express assignment, employers may still claim an employee's inventive work where the employer specifically hires or directs the employee to exercise inventive faculties. *United States v. Dubilier Condenser Corp.,* 289 U.S. 178, 187, 53 S.Ct. 554, 557, 77 L.Ed. 1114 (1933); *Standard Parts Co. v. Peck,* 264 U.S. 52, 59–60, 44 S.Ct. 239, 241, 68 L.Ed. 560 (1924). When the purpose for employment thus focuses on invention, the employee has

received full compensation for his or her inventive work. *See generally McCoy v. Mitsuboshi Cutlery, Inc.,* 67 F.3d 917, 920–21, 36 USPQ2d 1289, 1291 (Fed.Cir.1995) (finding implied license to sell patented goods by aggrieved seller where patentee breaches sales contract), *cert. denied,* — U.S. —, 116 S.Ct. 1268, 134 L.Ed.2d 215 (1996). To apply this contract principle, a court must examine the employment relationship at the time of the inventive work to determine if the parties entered an implied-in-fact contract to assign patent rights.

■ An implied-in-fact contract is an agreement "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Baltimore & Ohio R.R. v. United States,* 261 U.S. 592, 597, 43 S.Ct. 425, 426, 67 L.Ed. 816 (1923). By comparison, an implied-in-law contract is a "fiction of law where a promise is imputed to perform a legal duty, as to repay money obtained by fraud or duress." *Hercules Inc. v. United States,* — U.S. —, —, 116 S.Ct. 981, 986, 134 L.Ed.2d 47 (1996).

■ As a matter of common law, after the Supreme Court's decision in *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), state contract principles provide the rules for identifying and enforcing implied-in-fact contracts. Florida, however, like most states, follows pre-*Erie* Supreme Court decisions involving ownership of inventive rights. *See State Bd. of Educ. v. Bourne,* 150 Fla. 323, 7 So.2d 838, 839–40 (1942) (relying on *Peck, Dubilier, Solomons,* and *Hapgood* to identify Florida law on implied contracts to assign inventive rights). Under these rules, a Florida employer can not claim ownership of an employee's invention "unless the contract of employment by express terms or unequivocal inference shows that the employee was hired for the express purpose of producing the thing patented." *State v. Neal,* 152 Fla. 582, 12 So.2d 590, 591 (following *Bourne* ), *cert. denied,* 320 U.S. 783, 64 S.Ct. 191, 88 L.Ed. 470 (1943). Thus, when an employer hires a person for

general service and the employee invents on the side, the invention belongs to the employee. However, the employer may claim ownership of the invention if the employer hires a person for the "specific purpose of making the invention." *Id.*, 12 So.2d at 591. Even if hired for a general purpose, an employee with the specific task of developing a device or process may cede ownership of the invention from that task to the employer. *Id.; see also Goodyear Tire & Rubber Co. v. Miller,* 22 F.2d 353, 356 (9th Cir.1927).

▮ The existence of an implied-in-fact contract to assign inventive rights is a question of fact. *See Mount Sinai Hosp. of Greater Miami, Inc. v. Cordis Corp.,* 329 So.2d 380, 380 (Fla.Dist.Ct.App.1976); *see also Liggett Group, Inc. v. Sunas,* 113 N.C.App. 19, 437 S.E.2d 674, 678, 30 USPQ2d 1678, 1680 (1993). Consequently, we review the trial court's finding on this question of fact for clear error. *Reich,* 28 F.3d at 1082; *see Benrose Fabrics Corp. v. Rosenstein,* 183 F.2d 355, 357, 86 USPQ 237, 238 (7th Cir.1950) (labeling of a finding as one of law as opposed to fact is not determinative of its true nature).

In *Neal,* the Florida Supreme Court confronted a case similar to this one. Dr. Neal, a general employee of the State, was assigned to Project No. 239, to study the "digestibility, coefficients, and feeding value of dried citrus waste." *Neal,* 12 So.2d at 590. The project expanded to include "methods by which dried citrus waste could be made available as a dairy feed, the problem being to find a better method of excluding the moisture from it." *Id.* Dr. Neal invented a method to dry citrus waste. The state court concluded that the State owned the patent on that process.

In reaching this conclusion, the Florida Supreme Court considered that Dr. Neal was placed in charge of Project No. 239 and spent the majority of his time on that project. He used his employer's facilities and time to perfect his process. The goal of Project No. 239 was to develop a method to dry citrus waste. Dr. Neal's employer paid for patent protection on his process. As the court explained: "The contract of employment was in its inception general but when Project No. 239 was set up under the Purnell Act and Dr. Neal placed in charge, it was from that time hence for the express purpose of accomplishing the result that was accomplished." *Id.* at 591. The court also relied on the employer's payment of prosecution expenses in addition to the purpose of the project to find an implied-in-fact contract favoring state ownership of the patent rights. *Id.* at 591–92.

▮ Returning now to Teets, the specific goal of his project was to develop a one-piece leading edge. GE approached DRB to propose ways to apply a leading edge to turbine blades in its new engine. GE specifically and repeatedly expressed a desire for a one-piece solution. Faced with GE's requests, DRB, through Burnham, assigned Teets as the chief engineer on the GE90 project. Teets spent 70% of his time on that project. After undertaking the GE90 project and attempting several solutions to GE's problem, Teets developed the HFP. Teets reduced the invention to practice using DRB's resources— DRB's employees, DRB's shop tools and materials, and DRB's time. DRB has paid and continues to pay for the prosecution of a patent application for the HFP.

Most important, as recognized by the trial court, Teets repeatedly acknowledged DRB's role in the development of the HFP. He stated "DRB devised or developed" the HFP. In fact, the patent application lists another DRB employee, Burnham, as a co-inventor. Thus, Teets himself recognized DRB's role in the inventive activity.

These undisputed facts show an implied-in-fact contract of assignment between Teets and DRB. DRB specifically directed Teets to devise a one-piece leading edge for GE. Having directed Teets to that task, compensated him for his efforts, paid for the refinement of the process, and paid for the patent protection, Chromalloy owns the patent rights in the HFP. The Florida Supreme Court's decision in *Neal* governs this case and compels the conclusion that Teets entered an implied-in-fact contract to assign patent rights to Chromalloy.

▮ The district court committed legal error by focusing on irrelevant facts to find no implied contract. For example, the trial

court noted that no one at DRB had ever applied for a patent before the HFP application. The court apparently inferred from this that DRB was not in the business of inventing. The test for an implied-in-fact contract, however, does not focus on whether the enterprise in the past engaged in inventive activities, but whether the employee received an assignment on this occasion to invent. Teets in fact received the direct assignment to spearhead the GE90 project. The GE90 project, in turn, hinged on DRB's ability to find a one-piece leading edge for the composite fan blades. Teets received the assignment to solve GE's problem, which entailed invention.

 Moreover, regardless of DRB's failure to pursue patents earlier, Chromalloy did seek patent protection on behalf of Teets. Reluctance to seek patent protection in the past does not estop an enterprise from asserting its property rights in an invention.

 The trial court also noted that DRB did not enter an express agreement with Teets prior to the GE90 project. In the first place, DRB apparently had no express agreement of any kind with Teets. More important in this legal context, the absence of an express agreement characterizes all cases involving an implied-in-fact contract relationship. The absence of an express agreement does not foreclose the inquiry into the parties' intentions to assign inventive rights.

Finally, the district court relied upon the initial GE request that DRB use known processes when manufacturing the leading edge. Most, if not all, patentable ideas involve combinations of known elements. *See, e.g., Intel Corp. v. United States Int'l Trade Comm'n,* 946 F.2d 821, 842, 20 USPQ2d 1161, 1179 (Fed.Cir.1991). Consequently, GE's ambiguous limitation to known techniques does not preclude invention, let alone dictate the nature of relationships between DRB and its employees. In sum, the facts emphasized by the trial court do not preclude formation of an implied-in-fact contract.

## CONCLUSION

The undisputed facts about the development of the HFP show an implied-in-fact contract to assign patent rights to DRB. Consequently, this court concludes that the district court clearly erred in its determination that Teets owned any rights to the HFP.

## COSTS

Each party shall bear its own costs.

*REVERSED.*