762 So.2d 1052 (2000)
CITY OF COCOA, Florida, Appellant,
v.
Glynn LEFFLER, Gary Heller, et al., Appellee.
No. 5D99-1108.
District Court of Appeal of Florida, Fifth District.
July 28, 2000.
Bradly Roger Bettin, Sr., Anthony A. Garganese of Amari & Theriae, P.A., Cocoa, for Appellant.
Patrick F. Roche of Frese, Nash & Torpy, P.A., Melbourne, for Appellee.
*1053 THOMPSON, C.J.
The City of Cocoa, Florida ("Cocoa" or "City") timely appeals an Order Granting Glynn Leffler's and K.L.H. Environmental Inc.'s ("Leffler") Motion for Partial Summary Judgment. Because the partial summary judgment ruled in favor of Leffler on Cocoa's claim for a permanent injunction, we have jurisdiction. We reverse.
This case involves ownership of two patents and arises out of Cocoa's attempt to upgrade and improve its Wewahootee water treatment plant. The City decided to upgrade the system in 1993 when it received a permit to expand the plant's capacity. The City first approached an outside engineering firmCH2M Hill ("Hill")to consider ways to improve the hydrogen sulfide removal rate and to expand the plant's capacity. The design proposed by the outside firm utilized an aeration process to remove hydrogen sulfide from Cocoa's water. This was one of the only two known methods for removing hydrogen sulfide from water.[1]
The City was dissatisfied with the design proposed by Hill, in part because the proposed system would be expensive and difficult to maintain. Accordingly, the City created an in-house design team to improve on the proposed design. Seven employees were assigned to this "in-house" project. Glynn Leffler and Gary Heller, two of the defendants below, are two of the employees who were assigned to the project. The other five members of the team were: David King, Ed Wegerif, Carl Larrabee, Hershel Williamson, and Bill Nairn. Together, this group became known as the Wewahootee Design Team.
The team experimented with various aeration-based designs, the type of design utilized in Hill's proposal. During the experimentation process, a system malfunctioned, which led to a build-up of bacteria in the system. Upon learning that hydrogen sulfide was still being removed from the system, the team set out to explain and duplicate the results. The build-up of bacteria led the team to experiment with the use of bacteria to remove hydrogen sulfide from the water. This was an entirely new and theretofore unknown process for the removal of hydrogen sulfide from water.
The team ultimately developed a bacteriological-based system for removing hydrogen sulfide from Cocoa's water. The system is highly effective and more efficient than earlier systems. It removes almost 100% of hydrogen sulfide from water a much better rate than previously obtained. The design team also invented a process for cleaning the tanks in which the process took place, which greatly reduced the costs previously associated with these tasks.
Near the end of the design process, several members of the team realized that the process could be patentable. With the City's aid and blessing, the seven inventors applied for and received a patent on the process as a whole. Additionally, they applied for a second patent on the cleaning process and were awaiting approval on this patent as of the filing of this action. Upon the City's request, four of the seven inventors assigned their patent rights to the City. However, three of the inventors Leffler, Heller and Bill Nairnrefused to execute an assignment.[2]
The instant action was brought by Cocoa in August 1998 against the three inventors who refused to execute an assignment. Also named as a defendant was K.L.H. Environmental, Inc., a company believed to be marketing the invention. Count I of the complaint sought a declaration that the City was the owner of the patent rights arising out of the Wewahootee design project. Count II sought an injunction which would require the defendants to execute assignments of their rights to the patents and underlying inventions. Nairn assigned *1054 his rights to Cocoa subsequent to the filing of the complaint, and was dismissed from the action without prejudice.
In seeking to obtain a preliminary injunction, the City presented the testimony of Larrabee, a member of the team. According to his testimony, the task before the team, as assigned by the City, was to pick up where Hill left off and put together plans and specifications to improve on the Hill proposal. Larrabee said they knew they could create a better water treatment facility than Hill, although he acknowledged that no one on the team knew of a better design than the Hill design when they started the project. The City also paid to test and develop the system, with the test plant being at Wewahootee. Larrabee felt that the team met or exceeded its original assignment. The City agreed to pay for patenting.
The defense presented six witnesses, and together their testimony established that the need for a preliminary injunction had not been demonstrated by the City. One witness, Leffler, explained that the team had not been assigned the task of eliminating hydrogen sulfide. This could have been accomplished through the use of chlorine, a process which has been around since the early 1900's, but this would have been expensive. Rather, Leffler testified, the team's task was the refinement of the Hill system to make it workable for the City of Cocoa. Although Leffler's testimony was aimed at establishing that the City did not assign the team to invent, which would then place the ownership of the patent with the employees, he did admit that the team's job was to improve upon the Hill proposal, and that the task necessarily required the team to be creative. He also conceded that looking at alternatives to the Hill proposal would include "new approaches" because the team was "looking at something different" in their attempts to better the Hill proposal.
On December 18, 1999, the court denied the City's motion for a temporary injunction in a lengthy written order. The court concluded that the "invention" belonged to the inventors, and not the City, and therefore denied the City's motion for a temporary injunction, presumably because of the failure to establish a likelihood of success on the merits. Cocoa timely appealed that decision, and this court entered a brief opinion affirming, here quoted in its entirety:
The City of Cocoa appeals an order denying it a temporary injunction in a dispute over ownership of certain patents.
We have made a thorough review of the law governing the issues presented and find no basis to reverse the denial of the temporary injunction. We note, however, that the lower court's determination that "patent numbered 5,788,843 (August 4, 1998) belongs to the defendants and not the City of Cocoa ..." is valid only for purposes of the order appealed and is the ultimate issue to be decided at trial on the merits.

AFFIRMED.
City of Cocoa v. Leffler, 741 So.2d 612, 613 (Fla. 5th DCA 1999) (emphasis added).
After the trial court entered its order denying the preliminary injunction, the court denied Cocoa's motion to dismiss. In short order, this was followed by Leffler's motion for partial summary judgment. In this motion, Leffler moved for summary judgment on both counts of Cocoa's complaint. In response to the motion for summary judgment, Cocoa filed a memorandum in opposition and filed the affidavit of Larrabee. In his affidavit, Larrabee emphasized that the Team was charged with using their "creative abilities" in developing a better water treatment system.
The trial court entered a non-final order granting Leffler's motion for partial summary judgment, which by its terms only granted the motion as to the denial of the permanent injunction. This decision was reached before the trial court had the benefit of our opinion in the previous appeal. *1055 The trial court ruled that the team had been told to make a better water treatment plant, but not to invent a new method of hydrogen sulfide removal. Because the hydrogen sulfide removal method was unexpected, the City could not be said to have assigned that task to Leffler and the rest of the team.
We first note the general standard as to summary judgment. The party moving for summary judgment has the burden to prove conclusively the nonexistence of any genuine issue of material fact. Holl v. Talcott, 191 So.2d 40, 43 (Fla.1966). If the evidence raises any issue of material fact, if it is conflicting, if it will permit different reasonable inferences, or if it tends to prove the issues, it should be submitted to the jury as a question of fact to be determined by it. Id. at 43.
Next, we note that Florida, like most states, follows pre-Erie[3] United States Supreme Court decisions involving ownership of inventive rights. See Teets v. Chromalloy Gas Turbine Corp., 83 F.3d 403 (Fed.Cir.), cert. denied, 519 U.S. 1009, 117 S.Ct. 513, 136 L.Ed.2d 402 (1996). The common law generally regards an invention as the property of the inventor who conceived, developed, and perfected it. See 30 C.J.S. Employer-Employee s. 117 (1992). Thus, the general rule is that employees own the patent rights to their inventions, even though the inventions are conceived or reduced to practice during employment. See Hapgood v. Hewitt, 119 U.S. 226, 233-34, 7 S.Ct. 193, 30 L.Ed. 369 (1886); see also, United States v. Dubilier Condenser Corp., 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114 (1933) (the "mere existence of an employer-employee relationship does not of itself entitle the employer to an assignment of any inventions which the employee devises during the employment").
An exception to this general rule exists for those employees who have essentially agreed to sell or hire out their inventive faculties. Employees who have done so must transfer ownership of inventions made during the course of such employment to their employers. See State Board of Education v. Bourne, 150 Fla. 323, 7 So.2d 838 (1942).
There is no clear set of rules for determining whether an employee has been hired to "invent." Most cases focus on the contract of employment in determining whether an employee has been hired to invent. Whether such an agreement exists is generally considered a question of fact. Teets. The agreement need not be express, but can be implied from the terms of employment. See Teets, 83 F.3d at 406; Restatement of Agency (Second) s. 397 (1958). Nonetheless, courts have traditionally been "reluctant" to infer or imply an agreement to invent. This is because the idea which gave rise to patent rights was viewed as separate and distinct from the machine which was created to carry out or which was the embodiment of the patentable idea. See Dubilier, 289 U.S. at 187-88, 53 S.Ct. 554; see also Catherine L. Fisk, Removing the `Fuel of Interest' from the `Fire of Genius': Law and the Employee-Inventor, 1830-1930, 65 Univ. Chi. L.Rev. 1127, 1173 (1998).
In Bourne, the leading Florida case on ownership of inventive rights, the court thus recognized that an employer is entitled to an assignment of an employee's rights in an invention under the following circumstances:
The rule is settled in this country that one may sell or farm out his inventive facilities. That is to say, if he is employed for the express purpose of using his inventive faculty in the interest of his employer, the latter is entitled to all inventions made by him in performance of the contract. This rule has been frequently stated but one of the clearest statements we have found is in Solomons v. United States, 137 U.S. 342, 11 *1056 S.Ct. 88, 89, 34 L.Ed. 667[ (1890)], as follows:
`If one is employed to devise or perfect an instrument, or a means for accomplishing a prescribed result, he cannot, after successfully accomplishing the work for which he was employed, plead title thereto as against his employer. That which he has been employed and paid to accomplish becomes, when accomplished, the property of his employer. Whatever rights as an individual he may have had in and to his inventive powers, and that which they are able to accomplish, he has sold in advance to his employer.'
In United States of America v. Dubilier Condenser Corporation, 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114, 85 A.L.R. 1488[ (1933)], speaking of the foregoing rule and its converse, it was said that one who succeeds during his term of service in making an invention he was employed to make is bound to assign to his employer any patent he obtains. The reason is that he has only produced that which he was employed to do. The invention was the precise subject of the contract of employment. The very terms of the agreement necessarily are that what he was paid to produce belongs to his paymaster. Standard Parts Co. v. Peck, 264 U.S. 52, 44 S.Ct. 239, 68 L.Ed. 560, 32 A.L.R. 1033[ (1924)]. On the other hand, if the employment be general, though it may cover a field of labor and effort in the performance of which the employee conceived the invention for which he obtained a patent, the contract is not so broadly construed as to require an assignment of the patent. Hapgood v. Hewitt, 119 U.S. 226, 7 S.Ct. 193, 30 L.Ed. 369; Dalzell v. Dueber Watch-Case Mfg. Co., 149 U.S. 315, 13 S.Ct. 886, 37[31] L.Ed. 749.
Id. at 839-840. The Bourne court's ultimate ruling was:
When an employer undertakes to establish a claim to a patent or a patentable object as against his employee who is the inventor, he must show beyond question that the employment was for that specific purpose of making the invention. If the employment was general and was an incident to that, the employer cannot claim the patent.
Id. at 841 (emphasis added).
With the Bourne test in mind, summary judgment in favor of Leffler is equivalent to a trial court determination that there was no evidence before the trial court "that the employment was for that specific purpose of making the invention." Bourne. Thus, the trial court decided as a matter of law that the patent belonged to Leffler (and by extension the other inventors, although the other inventors but for one have assigned their rights to the City). Because there were disputed issues of material fact before the court, that decision was error.
The trial court ignored disputed material facts at the crux of the disputewhether the assignment of the employees to the team was enough to entitle Cocoa to a permanent injunction. The City characterizes it as a project to "improve" the system in use at Wewahootee, and the system proposed by Hill, by whatever means could be used, including the inventive process. Larrabee, a member of the team, submitted an affidavit which explains that the team was to use creative abilities to improve on the Hill system:
The [team] treated the issue of the dissolved gas removal system as an engineering problem which required an engineering solution. Because the CH2M Hill design was representative of a typical design for a dissolved gas removal system when it was submitted to Cocoa for review in 1992, the [team] would have to use its creative abilities to develop a superior system.
[e.s.]
Larrabee also emphasized that after reviewing the Hill plan, the general feeling *1057 was "there has to be a better way to do this." Larrabee's affidavit is buttressed by testimony at the hearing on the preliminary injunction: Heller testified that the team's goal was to improve upon the Hill proposal, and that the task necessarily required them to be creative; Leffler testified that the team's job was to improve upon the Hill proposal, and that looking at alternatives would include "new approaches" because the team was "looking at something differentwe wanted to do something different." This testimony, taken in a light most favorable to the City as the party against which summary judgment was entered, supports a potential conclusion that the City assigned the task of improving the water treatment facility with the possibility that creating or inventing a way to do so would be the final result. Although the Bourne test requires the City to show beyond question that the employment was for the specific purpose of making the invention, that standard is only applicable at the time of trial. At the summary judgment stage, however, the City's burden is to show that there are disputed issues of material fact regarding whether the employment was for the specific purpose of making the invention. When reviewing this case on summary judgment, the question is, "Can an agreement to assign patents be inferred from the City's assignment of its employees to a special project to improve Wewahootee's water treatment system?" On the facts as developed to this point, the answer is "yes." Compare Teets.
The evidence shows that none of the members of the team were hired by the City as inventors. Only two members of the team (Wegerif and King) were even engineers, and there was no showing that they were hired to solve a specific problem or exercise their "inventive faculties" on behalf of the City. The remaining members of the team were simply associated in some capacity with the operation of the City's water treatment system. Nevertheless, because there is some evidence that these employees were hired to create a better water treatment facility, which by extension could include creating a better way to do what the water treatment facility would do, including removing hydrogen sulfide, the trial court erred in granting summary judgment. Cf. Mount Sinai Hospital of Greater Miami, Inc. v. Cordis Corp., 329 So.2d 380 (Fla. 3d DCA 1976)(holding that in light of conflicting evidence on issues, question of whether cardiovascular instruments manufacturer was employed by hospital to devise an implantable synchronous pacemaker so that hospital was entitled to patent rights to pacemaker was for jury).
REVERSED and REMANDED.
W. SHARP, and PETERSON, JJ., concur.
NOTES
[1] The other known process used chlorine, but was cost-prohibitive.
[2] The inventors had to apply for the patent individually, regardless of whether they had assigned their rights to the City.
[3] Erie Railroad v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).